23 CV 6176-CSS

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

FORM TO BE USED IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983
(Prisoner Complaint Form)

1. CAPTION OF ACTION

A. Full Name And Prisoner Number of Plaintiff:
   1. Junarian Walker #11A1158

—v—

B. Full Name(s) of Defendant(s):
   1. Correction Officer Abrams
   2. Correction Officer B. Davis
   3. Correction Sergeant T. Dininny
   4. Medical Nurse Hakes
   5. Assistant Deputy superintendent
      of Mental Health L. Szablewski
   6. Deputy Superintendent of Security
      Kevin Brown
   7. Superintendent John Doe #1
   8. Hearing Officer S. Bottone

1

## 2. STATEMENT OF JURISDICTION

1  This is a civil action seeking relief and/or damages to defend and protect the rights guaranteed by the Constitution of the United States. This action is brought pursuant to 42 U.S.C. §1983. The court has jurisdiction over the action pursuant to 28 U.S.C. §§§ 1331, 1343 (3) and (4); and 2201

## 3. PARTIES TO THIS ACTION

A. PLAINTIFF's INFORMATION
1) Name and Prisoner Number of Plaintiff:
   Jundrian Walker #11A1158
   Present Place of Confinement & Address:
   Marcy Correctional Facility
   9000 Old River Rd., P.O. Box 3600
   Marcy ; NY 13403-3600

2

2)

**B. DEFENDANT's INFORMATION**
Name of Defendant #1: Abrams. His full name is UNKNOWN to plaintiff. Official Position of Defendant #1: He is a Correction Officer ("co") who works at Wende Correctional Facility ("Wende"), and who is employed by the New York State Department of Corrections and Community Supervision ("Doccs").
Defendant #1 is sued in his Individual and/or Official capacity
Address of Defendant #1: Wende Correctional Facility, P.O. Box 1187, 3040 Wende Rd, Alden, New York 14004-1187

3)

Name of Defendant #2: B. Davis. His full name is UNKNOWN to plaintiff. Official Position of Defendant #2: He is a Correction Officer ("co") who works at Elmira Correctional Facility ("Elmira"), and who is employed by the New York State Department of Corrections and

3

Community Supervision ("Doccs")
Defendant #2 is sued in his
Individual and/or Official Capacity
Address of Defendant#2: Elmira
Correctional Facility, 1879 Davis
St. P.O. Box 500, Elmira, New York
14901-0500

4) ■ Name of Defendant#3: T. Dininny.
His full name is UNKNOWN to
plaintiff.
Official Position of Defendant#3: He is
a Correction Sergeant ("Sgt.") who
works at Elmira Correctional
Facility ("Elmira"), and who
is employed by the New York
State Department of Corrections
and Community Supervision ("Doccs")
Defendant#3 is sued in his Individual
and/or Official Capacity
Address of Defendant#3: Elmira
Correctional Facility, 1879 Davis St.,
P.O. Box 500, Elmira, New York 14901-
-0500

4

(5) ⬤   Name of Defendant #4: Hakes. Her full name is UNKNOWN to plaintiff. Official Position of Defendant #4: she is a Medical Nurse ("Nurse") who works at Elmira Correctional Facility ("Elmira"), and who is employed by the New York State Department of Corrections and Community Supervision ("Doccs") Defendant #4 is sued in her Individual and/or Official capacity Address of Defendant #4: Elmira Correctional Facility, 1879 Davis St., P.O. Box 500, Elmira, New York 14901-0500

(6) ⬤   Name of Defendant #5: L. Szablewski Her full name is UNKNOWN to plaintiff. Official Position of Defendant #5: she is the Assistant Deputy Superintendent of Mental Health ("ADSM") at Wende Correctional Facility ("Wende"), and who is employed by the New York State Department of Corrections and Community Supervision ("Doccs")

Defendant #5 is sued in her Individual and/or Official capacity
Address of Defendant #5: Wende Correctional Facility, P.O. Box 1187, 3040 Wende Rd., Alden, New York 14004 - 1187

(7) Name of Defendant #6: Kevin Brown
Official Position of Defendant #6: He is the Deputy Superintendent of Security ("Dss") at Wende Correctional Facility ("Wende"), and who is employed by the New York State Department of Corrections and Community Supervision ("Doccs") Defendant #6 is sued in his Individual and/or Official capacity
Address of Defendant #6: Wende Correctional Facility, P.O. Box 1187, 3040 Wende Rd., Alden, New York 14004 - 1187.

(8) Name of Defendant #7: John Doe #1 His full name is UNKNOWN to plaintiff.

6

Official Position of Defendant #7: He is the Superintendent at Wende Correctional Facility ("Wende"), and he is employed by the New York State Department of Corrections and Community Supervision ("Doccs")
Defendant #7 is sued in his Individual and/or official Capacity
Address of Defendant #7: Wende Correctional Facility, P.O. Box 1187, 3040 Wende Rd., Alden, New York 14004-1187

(9) ▓ Name of Defendant #8: S. Bottone Her full name is UNKNOWN to plaintiff.
Official Position of Defendant #8: she is the Hearing officer ("HO") and Industrial superintendent who works at Elmira correctional Facility ("Elmira"), and who is employed by the New York State Department of Corrections and

Community Supervision ("Doccs")
Defendant #8 is sued in her
Individual and/or Official Capacity
Address of Defendant #8: Elmira
Correctional Facility, 1879 Davis
St., P.O. Box 500, Elmira, New York
14901-0500

## 4. PREVIOUS LAWSUITS IN STATE AND FEDERAL COURT

(1) A. Have you begun any other lawsuits in state or Federal court dealing with the same facts involved in this action? No

(2) B. Have you begun any other lawsuits in Federal court which relate to your imprisonment? YES

(3) 1. Name(s) of the parties to this other law--suit:
Plaintiff(s): Junarian Walker
Defendant(s): Correction Officer John Doe

(4) 2. District Court: Southern District of New York

8

(5)  3. Docket Number: 20-CV-5476

(6)  4. Name of District or Magistrate
     Judge to whom case was assigned
          Louis L. Stanton, United States
     District Judge

(7)  5. The approximate date the
     action was filed:

(8)  6. What was the disposition of
     the case?

(9)  7. Is it still pending? No

(10)      IF not, give the approximate
     date it was resolved

(11)  Disposition: Dismissed by court for
      failure to prosecute, pay filing fee
      or otherwise respond to a court order;

## 5. STATEMENT OF CLAIM

9

(1) <u>A. FIRST CLAIM:</u>  On July 14, 2020, Plaintiff was released from his cell, and went to the recreation yard ("yard") of the Intensive Intermediate Care Program ("IICP") in Wende Correctional Facility ("Wende").

(2) Less than 30 minutes after his arrival in the yard, Plaintiff was assaulted by another serious mentally ill/dangerously known incarcerated individual, who punched Plaintiff from his blind side, knocking him unconsciously to the ground.

(3) There were only three other serious mentally ill/dangerously known incarcerated individuals in the yard with Plaintiff when he was attacked.

(4) The attack took place while Plaintiff and the other three serious mentally ill/dangerously known incarcerated individuals were under the watch of Correctional Officer ("CO") Abrams.

10

(5) The Department of Corrections and Community Supervision ("Doccs") Employees at Wende as well as its Central Office had Known or should have known that CO Abrams have a total disregard to the SAFETY of the serious mentally ill incarcerated individuals in their care and custody, who is under the watch of CO Abrams, which results in other serious mentally ill incarcerated individuals (like the Plaintiff) being assaulted by another serious mentally ill incarcerated individual.

(6) However in Plaintiff's case, CO Abrams was not watching Plaintiff and the other three serious mentally ill / dangerously known incarcerated individuals, and he did not see Plaintiff being struck.

(7) CO Abrams only became aware of the assault on Plaintiff when he seen Plaintiff layed out on the ground severely

11

injured.

(8) Plaintiff's assailant has never been identified.

(9) After finding Plaintiff on the ground severely injured, CO Abrams had called in a Medical Emergency Response.

(10) After responding Doccs staff arrived on the scene, Plaintiff was carried on a medical stretcher to the Regional Medical Unit ("RMU") at Wende where he was medically evaluated.

(11) After Doccs Medical staff determined that Plaintiff injuries were severe, Plaintiff was rushed via ambulance to the Emergency Room in the outside hospital of Erie County Medical Center ("ECMC") for medical care and treatment for his injuries.

(12) Doccs staff at Wende never investigated the incident.

12

(13) After returning back to Wende from ECMc on July 14, 2020, Plaintiff was placed on Medical Observation Watch for his injuries, and he was placed on Suicide Watch for threats of self-harm and placed in the infirmary of the RMU

(14) On July 15, 2020, Plaintiff was cleared from Suicide Watch, and discharged from the infirmary.

(15) After being discharged from the infirmary, Plaintiff was placed on a 14-day Covid-19 Quarantine ("Quarantine") in C-Block at Wende

(16) On July 30, 2020, plaintiff was cleared from quarantine, where Doccs staff then tried to place plaintiff back in the IICP with his unidentified assailant despite the fact that the unidentified assailant had assaulted and seriously injured plaintiff in the IICP on July 14, 2020

13

(17) Due to Doccs staff total disregard to plaintiff's safety, it led plaintiff no choice but to seek refuge in a Mental Health Observation cell, where he remained from July 30, 2020 until he was transferred to Elmira on September 8, 2020.

(18) As a result of being assaulted by another serious mentally ill incarcerated individual on July 14, 2020, plaintiff suffered severe physical, mental, and emotional anguish.

(19) The particulars of plaintiff's damages are as follows:

(a)      Medical staff in Wende who medically evaluated plaintiff after he was found on the ground by CO Abrams, had observed and noted that plaintiff was unable to report what happened to him, Plaintiff was alert but slow to respond to commands and only followed commands after much encouragement

14

(b) , Plaintiff was confused, Plaintiff had repetitive speech, and when Medical staff asked plaintiff for his date of birth, plaintiff kept saying a different birth date then what is on his Doccs File.

(c) Medical staff in Wende even observed and noted that plaintiff had a superficial abrasion on his right forehead, a large hard protrusion in his left jaw, and they claimed that he had a small abrasion to his right dorsal hand.

(d) Medical staff in ECMC did a physical exam on plaintiff and observed and noted that plaintiff had a 1.5 cm superficial abrasion on his right forehead, and a moderate amount of swelling in his left mandible.

(e) No other abrasions was found on plaintiff's body, and no abrasions

15

was found on his hands when the Medical staff at ECMC did a physical exam on the day plaintiff was assaulted

(f) Medical staff at ECMC noted that plaintiff was having headaches.

(g) Medical staff at ECMC had a diagnostic test (CT-scan) performed on plaintiff head which found that plaintiff had a facial soft tissue contusion on the left side of his face.

(h) No further diagnostic testing or medical investigation was given into plaintiff's injuries.

(i) While on quarantine, plaintiff went to his Dental call out where he was seen by Dental staff at Wende, who noted that plaintiff had a left fractured bottom back tooth.

(j) Dental staff at Wende even noted that plaintiff had swelling in his left jaw

16

area from a infection that developed on a later occasion

(k) While under Mental Health Observation, Mental Health Staff at Wende had observed and noted that plaintiff had memory deficits, memory loss, Knowledge deficits, and delays and limited Intellectual/Cognitive Functioning which are all signs and symptoms that are consisted with plaintiff having a Traumatic Brain Injury.

(l) Plaintiff's primary Mental Health psychiatrist had observed and noted that plaintiff had Head Trauma, and Post Concussion Signs/Symptoms (head aches, memory impairment, and photo sensitivity).

(m) Plaintiff's primary mental health psychiatrist even observed and noted that plaintiff have a Post Traumatic Stress Disorder.

17

(20)    The treatment that plaintiff received for his injuries that he sustained on July 14, 2020, are as follows:

(a)    While at Wende, plaintiff was prescribed Ibuprofen 600 mg for the physical pain he had from his injuries.

(b)    While at Wende, plaintiff received soft food diet meals due to his jaw pain and his inability to open his mouth fully.

(c)    While at Elmira, plaintiff was prescribed Topamax to prevent his headaches from occuring until it was discontinued when he was at Five Points Correctional Facility ("Five Points") but he had it re-- prescribed while he was at Coxsackie Correctional Facility ("Coxsackie")

18

(d)          While at Wende, Plaintiff was prescribed anti-biotics for the infection in his left jaw that later developed.

(e)          While at Great Meadow from June 2021 to February 2022, Dental staff at Great Meadow had to pull and exract plaintiff's fractured left bottom back tooth out of his mouth.

(21) The constitutional basis for this Claim under 42 U.S.C. § 1983 is:

(a)          This Claim is for the violation of plaintiff's Eighth Amendment right, committed by Co Abrams, who acted with deliberate indifference to plaintiff's safety when he left plaintiff in the yard of the IICP unsupervised with 3 other serious mentally ill incarcerated individuals which resulted in plaintiff being physically assaulted and severely injured by 1 of the 3 serious mentally ill incarcerated individuals on July 14, 2020 at Wende

19

(b)    This Claim is for the violation of plaintiff's Eighth Amendment right, committed by Supt. John Doe #1, Dss Brown, and ADSM Szablewski, who acted with deliberate indifference to plaintiff's safety when they permitted Doccs Security staff to attempt to place plaintiff back in the IICP on July 30, 202 despite the fact that his assailant was never captured after assaulting him on July 14, 2020 thereby forcing him to find refuge in the Mental Health Observation Unit from July 30, 2020 until he was transferred to Elmira on September 8, 2020.

(22) Plaintiff requests that this Court grant him the following relief:

(23)   Issue a declaratory judgment stating that;

(a)    CO Abrams violated plaintiff's Eighth Amendment right to be free from infliction of cruel and unusual punishment due to being

20

deliberately indifferent to plaintiff's safety.

(b)      Supt. John Doe #1, Dss Brown, and ADSM Szablewski had violated plaintiff's Eighth Amendment right to be free from infliction of cruel and unusual punishment due to being deliberately indifferent to plaintiff's safety

(24)   Award compensatory damages in the following amounts:

(a)            $1,500,000 against Co Abrams for the physical, mental and emotional injuries plaintiff sustained as a result of being physically assaulted by another seriously mentally ill incarcerated individual

(25)   Award punitive damages in the following amounts:

(a)            $150,000 against Co Abrams.

(b)        $150,000 each against Supt.

John Doe #1, Dss Brown, and ADSM
Szablewski.

(26)    Exhaustion of Your Administrative
Remedies for this Claim:

(a)    Did you grieve or appeal this claim?
Yes, plaintiff filed a grievance dated
9-16-2020 "RE: I was physically assaulted
by a unknown person, physically and
sexually assaulted by prison staff, sexually
harassed and harassed by prison staff,
prison staff failed and refused to protect
me; I was held hostage and tortured
in a Mental Health Suicide Watch Unit
I was denied medical and mental health
treatment" See Exhibit 1.

(b)    If yes, what was the result? The
superintendent determined that the
investigation has revealed no evidence
that the alleged behavior occured, and
thereby denied plaintiff's grievance
See Exhibit 2.

22

(c)    Did you appeal that decision? Yes, plaintiff appeal to the Central Office Review Committee ("CORC") on 10-30-2020 see Exhibit 2

(d)    If yes, what was the result? The CORC had determined upon full hearing of the facts and circumstances and upon recommendation of the Division of Health Services; the action requested in the grievance is thereby denied. The CORC upheld the Superintendent determination See Exhibit 3.

(e)    The CORC even noted from the facility investigation that a medical emergency was called to the yard on 7/14/20 when the plaintiff was observed laying on the ground and it was determined that he was assaulted by an unknown incarcerated individual resulting in an injury to his jaw. The plaintiff was transported to an outside hospital for treatment and admitted to the facility infirmary upon discharge and placed on suicide watch for threats of self-harm See Exhibit 3

(27)    IF you did not exhaust your administrative remedies, state why you did not do so:

(a)                    If there are any claims that plaintiff forgot to include and failed to exhaust, PLEASE TAKE NoTICE that plaintiff is suffering Fram signs and symptoms that are consistent with him having a Traumatic Brain Injury / post concussion in which it prompt medical staff to order diagnostic testing for his brain See Exhibit 4.

(28)    B. SECOND CLAIM: On January 11th, 2021, plaintiff received a call out request to see a psychiatrist in the Mental Health Unit in Elmira for the first time since being transferred to Elmira from Wende on September 8th, 2020.

(29)    Plaintiff was escorted to his call out by CO Davis, who was the escort officer for F-Block - 7 company on January 11th, 2021

24

(30)   While plaintiff was attending his session with the psychiart, plaintiff's Mental Health therapist was sitting between the door and CO Davis was standing nearby with another CO that works in the Mental Health Unit.

(31)   The door to the room was open because plaintiff's therapist was sitting between it as plaintiff was speaking with the psychiatrist about him being sexually harassed, and physically and sexually assaulted by staff in Wende.

(32)   After his session was over, plaintiff was escorted back to his cell (F-7-5cell) by CO Davis.

(33)   After securing plaintiff in his cell and walking off to join other CO's that was sitting around the CO's station which is on the floor that's adjacent to 7 and 8 company of F-Block, Plaintiff was able to hear CO Davis tell the other CO's that plaintiff filed a PREA against

25

Staff.

(34) Plaintiff do not know who the other CO's were that CO Davis was talking to, but from the vantage point he had from his cell, plaintiff was able to hear CO Davis discuss his PREA business with the other CO's, and he was able to hear them making fun of him such as hearing one of the CO's respond "Rape!!, Rape!!, Help me CO" as they was making fun of plaintiff.

(35) Then on the next day which was on January 12th, 2021, CO Davis, Sgt. Dininny, and other unknown CO's came to plaintiff's cell, opened it, sprayed plaintiff excessively in his face and body with OC pepper spray.

(36) As plaintiff was rubbing his irritated eyes due to being peppered sprayed, CO Davis, Sgt. Dininny and other CO's rushed into plaintiff's cell and gave him multiple excessive body blows.

26

(37)  One of them hit plaintiff in the head
a couple of times but was told by
another staff "No Head, just beat his
body.

(38)  After they was done beating him, Plaintiff
was placed in handcuffs and taken
out of his cell and escorted off the
company.

(39)  Plaintiff was then thrown to a wall
outside of 7 company, between the
Kiosk and 7 company, and then thrown
to the floor where he was beaten up
again by staff.

(40)  After the assault on plaintiff, Plaintiff
was taken to the Medical Unit where
he was seen by Nurse Hakes.

(41)  Plaintiff was allowed to only use water
to flush the chemical agents of the
OC pepper spray from out of his eyes.

(42)  After plaintiff was done flushing the

27

chemical agents from out his eyes, Nurse Hakes asked him if he would like to make a statement in which Plaintiff told her "Yes" but one of the CO's that accompanied them, told Nurse Hakes to not let plaintiff make a statement, and to state in her injury report that Plaintiff stated that he have no injuries.

(43) Nurse Hakes did just as the CO had commanded her to do, and then tried to get plaintiff to sign his signature on the injury report in which plaintiff refused to sign because he did have injuries to report.

(44) Nurse Hakes refused to give plaintiff treatment for his injuries and she refused to refer plaintiff to any medical staff that can give plaintiff treatment for his injuries he sustained as a result of being physically assaulted by staff.

(45) Plaintiff was then taken to a special

28

housing Unit (SHU) by a Sgt. (presumed to be Sgt. Dininny) and other CO's.

(46) Plaintiff was placed on SHU status pending a Tier 3 disciplinary hearing ("hearing") based on two false misbehavior reports ("report") that CO Davis and Sgt. Dininny written on plaintiff to cover up the unneccesary/excessive use of force that they had on plaintiff as a retaliation for him filing a PREA complaint on staff.

(47) As a result of being assaulted by CO Davis, Sgt. Dininny and other staff on January 12, 2021, plaintiff suffered severe physical, mental, and emotional anguish.

(48) The particulars of plaintiff's damages are as follows:

(a) He had a painful lump protruding out his left rib area in which it took over a year to get it diagnose and treated

29

(b)    He had breathing difficulties, and everytime he sneezed or yarn, his left rib area, chest area, and lungs will hurt.

(c)    His eyes, face, and body was irritated and burning from the affect the chemical agents of the OC pepper spray caused on him.

(d)    His pre-existing signs/symptoms of his Traumatic Brain Injury / Post --Concussion was exacerbated

(e)    His PTSD was exacerbated as well

49)    The treatment that plaintiff received for his injuries that he sustained on January 12, 2021, are as follows:

(a)    In January 2022, Plaintiff received a CT-scan on his left rib. According to the CT-scan results, it found that plaintiff have a separation at the costochondral junction of his left

30

eighth rib likely related to prior traumatic injury with anterior displacement of the rib cartilage.

(b)  On June 1st, 2022, Plaintiff received surgery on his left 8th rib, where he was cut opened, and where the protruding part of his left 8th **rib** was cut out.

(c)  Plaintiff was prescribed lidocaine patches for his left rib injury.

(d)  Plaintiff was given a Albuteral inhaler pump to help with his breathing difficulties.

(50)  The constitutional basis for this claim under 42 U.S.C. § 1983 is:

(a)  The actions of CO Davis, and Sgt. Dininny in using unneccessary/excessive force against the plaintiff without need or provocation, were done maliciously and sadistically and constituted cruel and unusual punishment in violation of

31

plaintiff's Eighth Amendment right.

(b)   This Claim is for the violation of plaintiff's Eighth Amendment right, committed by Nurse Hakes, who acted with deliberate indifference to plaintiff's serious medical needs when she failed to note and treat plaintiff's left rib injury and breathing difficulties and/or refer him to be seen by a Doctor who can diagnose and treat plaintiff's left rib injury and breathing difficulties.

(51)  Plaintiff requests that this Court grant him the following relief:

(52)   Issue a declaratory Judgment stating that:

(a)               * Co Davis and Sgt. Dininny violated plaintiff's Eighth Amendment right to be free from infliction of cruel and unusual punishment due to using unneccessary/excessive use of force

32

(b)     Nurse Hakes violated plaintiff's Eighth Amendment right to be free from infliction of cruel and unusual punishment due to being deliberately indifferent to plaintiff's serious medical needs.

(53)    Award compensatory damages in the following amounts:

(a)     $ 2,500,000 jointly and severally against CO Davis, and Sgt. Dininny for the physical, and emotional injuries which was sustained as a result of their unneccessary / excessive use of force on plaintiff.

(b)     $ 500,000 against Nurse Hakes for the physical, and emotional injury resulting from her failure to provide adequate medical care to the plaintiff

(54)    Award punitive damages in the following amounts:

(a)     $ 150,000 each against CO Davis, and Sgt. Dininny

33

$150,000 against Nurse Hakes

(55)    Exhaustion of Your Administrative Remedies for this Claim:

(a)    Did you grieve or appeal this Claim? Yes, plaintiff filed a grievance dated 1-27-2021 "I was physically assaulted by staff who retaliated on me due to my PREA complaint I have pending on staff in a prior ; Medical staff is refusing to note and treat my injuries I sustained from being assaulted. Placed me on SHU sanctions under False Allegations contained in Misbehavior Report." Plaintiff had supplemented his grievance dated 1-27-2021 on 2-8-2021 See Exhibit 5.

(b)    If yes, What was the result? The Superintendent determined that the investigation has revealed no evidence that the alleged behavior occured, and thereby denied plaintiff's grievance See Exhibit 6.

(c)    Did you appeal that decision? Yes, plaintiff appealed to the CORC on 3-1-2021 see

34

Exhibit 6.

(d)  If yes, what was the result? The CoRC never responded to plaintiff's appeal

(56)  If you did not exhaust your administrative remedies, state why you did not do so:

(a)  If there are any claims that plaintiff failed to exhaust, PLEASE TAKE NOTICE that plaintiff is suffering from signs and symptoms that are consistent with him having a Traumatic Brain Injury /Post-Concussion in which it prompted medical staff to order diagnostic testing for his brain See Exhibit 4

(b)  PLEASE TAKE NOTICE that plaintiff informed the Elmira Inmate Grievance Program Supervisor (IGPS) [M. O'Dell] about him suffering from confusion and memory difficulties and asked her to bear with him when he supplemented his grievance dated 1-27-2021 See Exhibit 7

35

(c)   PLEASE TAKE NOTICE that instead of taking plaintiff Traumatic Brain Injury /Post-Concussion signs/symptoms into consideration, IGPS o'Dell took advantage of him and made it hard for plaintiff to exhaust his administrative remedies by refusing to process and forward his appeal to the CoRC

(d)   Plaintiff, who was suffering from signs and symptoms that are consistent with having a Traumatic Brain Injury /Post-Concussion, was confused and did not know what to do next due to his memory difficulties.

(e)   So on 3-16-2021, plaintiff served a Complaint dated 3-16-20201 (See Exhibit 7) and a copy of his appeal of his appeal of the Superintendent response dated 3-1-2021 (See Exhibit 6) on the Director of the Inmate Grievance Program ("Director") see Exhibit 8.

(f)  In his complaint, the plaintiff told

36

the Director that IGPS O'Dell is giving him a hard time with exhausting his administrative remedies, and due to that, he requested that the Director filed and process his appeal dated 3-1-2021 to the CORC See Exhibit 7.

(g) He also requested that the Director stop IGPS O'Dell from preventing him from exhausting his administrative remedies See Exhibit 7.

(h) Plaintiff never received a response from the Director or CORC.

(i) Plaintiff did the best he could to exhaust his administrative remedies, and he did it while suffering from signs/symptoms that are consistent with having a Traumatic Brain Injury / Post Concussion

(57) C. THIRD CLAIM: On February 3rd, 2021, Plaintiff's Tier 3 Disciplinary Hearing ("Hearing") was commenced

37

by Hearing Officer ("HO") Bottone.

(58) The Hearing was for the two Misbehavior Reports ("Report") that were written by CO Davis and Sgt. Dininny after they (along with other unknown staff) assaulted on 1-12-2021 and had him placed in the SHU for no reason.

(59) According to CO Davis report, On 1-12-2021 CO Davis written a report on plaintiff charging him for violating rule(s) 118.22 Unhygienic Act, 106.10 Refusing Direct Order, 102.10 Threats, and 112.22 Visibility Obstruction.

(60) CO Davis alleged in his report that when he was making his security rounds, plaintiff had his cell bars covered with a sheet blocking his visual view of the inside of plaintiff's cell. As he was taking the sheet off plaintiff's cell bars, plaintiff used a white bucket to throw a unknown liquid on him which got

38

on his arms, and the back of his shirt and the back of his pants leg. As CO Davis was exiting the situation, that's when plaintiff started yelling he's going to kill him.

(61) According to Sgt. Dininny report, on 1/12/2021, Sgt. Dininny written a report on plaintiff charging him for violating rule(s) 104.11 Violent conduct, 104.13 creating a disturbance, 100.11 Assault on staff, 107.10 Interference with employee, and 106.10 Refusing Direct Order.

(62) Sgt. Dininny alleged in his report that he was authorized by Lieutenant ("Lt.") Ayers to take plaintiff to the SHU for throwing a unknown liquid on CO Davis. Sgt. Dininny came to plaintiff's cell and told him to turn around to get handcuffed at his cell gate so he can go to the SHU. Plaintiff complied but when the cell door opened he turned around

and tried to head butt Sgt. Dininny in which he used force by spraying plaintiff twice in the face with chemical agents from his Oc spray. However, plaintiff still resisted, so Sgt. Dininny used more force on him by using body holds in which plaintiff became compliant and the Sgt. Dininny was able to handcuff him and took him to the medical unit afterwards

(63) Plaintiff pled NOT GUILTY to all charge(s) of both reports.

(64) As his defense against all charges, Plaintiff made record that CO Davis, Sgt. Dininny, and other unknown CO's had opened his cell door and came to his cell and started excessively spraying him with chemical agents from their Oc sprays, and then they physically assaulted inside his cell for no reason, and then bringing him out of his cell handcuff and used unneccessary/excessive force

40

on him again, off the company but near by the front of the company.

(65) After the unneccessary/excessive use of force, plaintiff was taken to medical where Doccs security staff made Nurse Hakes refuse to note and treat plaintiff injuries that he sustain.

(66) Then he was taken to the SHU, where on a later occasion he was served two reports that was written by CO Davis and Sgt. Dininny which contained false accusations in a attempt to cover up the fact that they along with other CO's had physically assaulted plaintiff.

(67) Plaintiff even made record that the assault was a retaliation against him for filing a PREA complaint against staff.

(68) As a Attempt to prove his version of the incident, Plaintiff requested for

41

all the incarcerated individuals who were housed on 7 company in F-Block with him at the time of the incident, who could have been potential witnesses that witnessed Co Davis, Sgt. Dininny, and other Co's use unneccessary/excessive force on plaintiff without plaintiff provoking them.

(69) HO Bottone initially agreed to find only two incarcerated individuals that were closest to plaintiff's cell and stated that "the rest of them are all going to say the same thing.... if one of them saw it, all of them saw it".

(70) HO Bottone did not ascertain the contents of the requested witnesses' testimonies, yet, for her to even decide to reject the testimony of the witnesses based on redundancy.

(71) HO Bottone just made an unfounded assumption about the redundancy of the testimony without knowing the content of the proposed

42

witnesses' testimonies and before any witnesses testified at the hearing.

(72) HO Bottone adjourned the hearing on February 3rd, 2021 to go locate and gather the two incarcerated individuals that were closest to plaintiff's cell.

(73) However, the odds against plaintiff had gotten even greater when HO Bottone resumed the hearing on 2-9-21 and denied plaintiff to even have the two incarcerated individuals as his witnesses which she agreed to locate and gather for him when she adjourned the hearing on February 3rd, 2021.

(74) HO Bottone argued that plaintiff's requested incarcerated witnesses would not have been able to see into the cell and that because plaintiff allegedly had a sheet up, they wouldn't have been able to see him allegedly throw liquids.

43

(75)    HO Bottone decision to deny plaintiff's two incarcerated witnesses which she agreed to locate and gather was unreasonable because plaintiff's witnesses didn't have to be able to look into plaintiff's cell.

(76)    It is distinctly possible that some (if not all) of the incarcerated individuals on 7 company in F-Block may have had a vantage point to know what's going on out on the company, and were either aware of their surroundings at all times or at the time in question and may have seen when staff for no reason, had assembled at plaintiff's cell and started excessively spraying him with chemical agents from their OC sprays, and then rushing into Plaintiff's cell where they physically assaulted him, and assaulted him again near the front entrance of the company, while some (if not all) of them may have heard the exchange.

44

(77) However, the opportunity to have his witnesses to support his innocence never presented itself because Ho Battone had prevented plaintiff's incarcerated witnesses from testifying at the hearing.

(78) Ho Battone prevented plaintiff from defending himself against all the charges that were against him when she denied his incarcerated witnesses who could have supported plaintiff's defense and helped him prove his innocence

(79) These incarcerated witnesses testimonies could have supported plaintiff's defense and helped him prove that he was innocent and never provoked staff to assemble at his cell and use force on him, and he never provoked them to use force on him near the front entrance of the company.

(80) These incarcerated witnesses testimonies could have corroborated with plaintiff's

45

testimony and the following facts:

(81) There is no evidence to prove that CO
Davis was splashed with a unknown
liquid because:

(a) There is no photographs, records, or
anything stored as evidence that shows
how CO Davis face, body, or clothing
appeared on/after the time in question.

(b) There's no photographs or records of
CO Davis alleged wet shirt, pants,
and arms, and the alleged wet shirt
and pants was never collected and
stored as evidence.

(c) There's no photographs or records
of the alleged white bucket that
plaintiff allegedly used to throw
the unknown liquid out of, and the
alleged white bucket was never collected
and stored as evidence.

(d) And there's no samples of the alleged

46

unknown liquid collected and stored as evidence, and there is no photographs or records of the samples nor is there photographs or records of where the samples were collected. from.

(82)    According to Sgt. Dininny report and hearing testimony, the reason he came to plaintiff's cell was to take plaintiff to the SHU for splashing Co Davis with a unknown liquid.

(83)    However, As mention in subparagraph a-d of paragraph 81 , there is no evidence to prove that Co Davis was splashed with a unknown liquid, and there's no proof that this unknown liquid exist, which obviously proves that Co Davis falsely accused plaintiff of splashing him with a non-existent unknown liquid by using a white bucket that never existed either.

(84)    According to the Unusual Incident ("UI")

report, Sgt. Dininny had determined that the unknown liquid was water.

(85)  However, Being that Sgt. Dininny determined that a non-existent unknown liquid was water, it proves that Sgt. Dininny tried to corroborate with CO Davis false report by also falsely stating that the non-existent unknown liquid was water, while knowing that the liquid never existed to base his determination on what it is, and which also proves that Sgt. Dininny knew that CO Davis was never splashed.

(86)  And being that Sgt. Dininny knew that CO Davis was never splashed, it proves that Sgt. Dininny had no honest reason to be at plaintiff's cell.

(87)  According to Sgt. Dininny report and hearing testimony, when he came to plaintiff's cell, he had the plaintiff's cell door open before

48

hand cuffing him.

(88) According to Sgt. Dininny, the reason he had plaintiff's cell door opened before hand cuffing him and taking him to the SHU was because plaintiff's cell door slot was too high for him to be handcuffed thru the cell door slot , so Sgt. Dininny on choice was to hand cuff plaintiff while the door was opened.

(89) Ho Bottone even defended Sgt. Dininny and falsely stated that Sgt. Dininny stated that the cell bars was too high as well.

(90) Whatever may be the case, there is evident proof that the cell ~~door~~ slot and the cell bars of F-7-5 cell was not too high for plaintiff to be handcuff thru before his cell door was open.

(91) However, Ho Bottone prevented plaintiff from proving that the cell door slot

49

and cell bars of F-7-5 cell was not too high for him to be handcuff thru before his cell door was open.

(92) Ho Bottone should have known herself, that the cell door slot and cell bars of F-7-5 cell was not too high for plaintiff to be handcuff thru because she is the Industrial Superintendent of Elmira, and F-Block is the Housing area for her industrial workers.

(93) And, being that she is one of the superintendents of Elmira, she should have had knowledge of self that the cell door slot and cell bars of F-7-5 cell just like all the other cells in F-Block, was not too high to handcuff plaintiff thru.

(94) And given the fact that the cell door slot and cell bars was not too high for someone to be cuffed thru, Ho Bottone should have known Sgt. Dininny was lying about such a thing

50

just to use as a excuse for not handcuffing plaintiff before he had plaintiff's cell door open.

(95) Plaintiff, who was considered a threat to the safety and security of staff, had to be handcuffed and secured before his cell door is opened as per DOCCS protocol, especially if it was true that he was being transported to SHU for splashing CO Davis with a unknown liquid or water.

(96) Being that the cell door slot and cell bars of F-7-5 cell was not too high for plaintiff to be handcuff thru, it proves that Sgt. Dininny lied and did not have a honest reason to not handcuff plaintiff before opening his cell door.

(97) According to Sgt. Dininny, once he had plaintiff's cell door open, he had to use force on plaintiff because plaintiff tried to head butt him.

51

(98) According to Sgt. Dininny, he only used force in the form of 2 applications of OC pepper spray and then body holds to gain control of plaintiff who was alleged to be resistant even after being sprayed in the face by OC pepper spray.

(99) However, as a result of the use of force, plaintiff sustained a lump that was protruding out of his left rib area, breathing diffulties, and confusion and memory difficulties (due to a pre-existing Traumatic Brain Injury / Post Concussion that was exacerbated by the Use of Force) which he exhibited to HO Bottone during the hearing.

(100) It's obvious that someone used some form of excessive physical force to cause such injuries because 2 sprays of OC pepper spray and body holds alone wouldn't have caused all the injuries that plaintiff sustain as a result of the use of force.

52

(101)    There were other staff including co Davis, who along with Sgt. Dininny had opened plaintiff's cell door, excessively sprayed him with their OC pepper sprays, and then rushed inside his cell and used excessive physical force on him in his cell and another time near the front entrance of the company.

(102)    None of the staff who was involved or present in the use of force was identified and none of their roles in the use of force was indicated.

(103)    The only staff that was identified was Sgt. Dininny who claims to only have used force in the form of 2 sprays of OC pepper spray and body holds on plaintiff.

(104)    Ho Bottone refused to consider plaintiff's testimony regarding the incident, and she denied all of his supportive witnesses to testify.

(105) Instead, she only considered Co Davis and Sgt. Dininny reports and testimonies and found them to be credible when the above mention proves that their reports and testimonies was made and given to bring disciplinary action on plaintiff to cover up their misconduct.

(106) If HO Bottone fairly considered the above mention in paragraphs 81-103, and if she considered plaintiff's testimony and allowed his supportive incarcerated witnesses to testify at the hearing, HO Bottone with a fair state of mind, would have found that plaintiff was assaulted by staff for no reason, and she would have had no choice but to find plaintiff NOT GUILTY of all charges because the reports that was written by Co Davis and Sgt. Dininny was made to cover up the unneccessary/excessive use of force and justify why they and other unidentified staff was at plaintiff

54

cell to begin with.

(107) But HO Bottone did not care for plaintiff's innocence, she had her mind made up to find plaintiff GUILTY before the hearing was concluded, just to help cover up what Sgt. Dininny, C.O. Davis, and the other unidentified staff did to plaintiff.

(108) In fact, while plaintiff (who suffered from confusion, and memory difficulties) was developing the hearing record by making numerous attempts to establish all his points and arguments of his defense against the charges he faced, despite HO Bottone making it hard for him to defend himself, HO Bottone just came out of no where and interrupted and stopped plaintiff from defending himself, and told him that she is concluding the hearing so she can do her disposition.

(109) After concluding the hearing to do

her disposition, HO Bottone resumed the hearing on 2-9-2021 to render her disposition in which she found plaintiff guilty of all charges except for 102.10 threats.

(110) The penalties that she imposed on plaintiff were 180 days in SHU, 180 days of loss of packages, and 180 days of loss of commissary

(111) HO Bottone decision caused plaintiff to remain wrongfully confined in the SHU.

(112) As a result of plaintiff's wrongful confinement to the SHU / Residential Mental Health Unit ("RMHU"), the following conditions that plaintiff endured during such confinement, had imposed an atypical and significant hardship on him until he was released from Five Points RMHU on June 15, 2021:

56

(113) On 1-12-21, plaintiff was placed in Elmira SHU as a result of CO Davis, Sgt. Dininny and other staff misconduct which was their violent brutal assault on plaintiff followed by CO Davis, and Sgt. Dininny false reports giving rise to disciplinary action against plaintiff to cover up their misconduct

(114) On 1-12-21, plaintiff was placed in the SHU of Elmira, without any medical treatment for his left rib injury, breathing, and his Traumatic Brain Injury / Post concussion which was exacerbated by the unneccessary /excessive use of Force.

(115) In an attempt to get medical attention mainly for his left rib injury, On 1-12--21, plaintiff first made threats to harm himself with hopes that Mental Health ("OMH") staff will get him some medical help for his left rib injury once he is placed under their watch in the

57

OMH suicide watch unit.

(116) As soon as plaintiff was seen by OMH staff, he brought his medical concerns, mainly his left rib injury, to their attention in which the OMH staff had informed the medical staff, about plaintiff left rib injury

(117) When plaintiff was seen by medical while in the OMH suicide watch unit, the Nurse examined only the plaintiff right side of his rib and not his left side of his rib.

(118) When plaintiff told her that his injury is on the left side and not on the right side of his ribs, the told plaintiff that she was only told to examine his right side of his ribs and that's all she's doing which seems fine, except she notes that he does have some breathing diffulties

58

(119) Seeing that it wasn't getting him no help by seeking for medical care in a safe and peaceful way, plaintiff manipulated OMH staff to discharge him by making them think he was fine.

(120) OMH, discharge plaintiff on 1/14/21 and plaintiff was taken back to the SHU and placed in his assigned cell where he remained until the CO's gave him a phone tablet on 1/15/21 in which plaintiff used to call his mother and tell her what happened to him and he advised her to get him a legal advocate.

(121) After the phone call, plaintiff collected pills from other Incarcerated Individuals and waited for the OMH staff to do rounds in which he took a handful of pills in front of her just to manipulate staff to rush him to the outside hospital to be treated for his overdose

(122) Plaintiff was rushed to the outside hospital to be treated for his overdose just as he wanted because he believed once the Hospital staff examine him, they will notice the lump in his left rib and diagnose it and treat it.

(123) However, while at the outside hospital, plaintiff brought to the medical staff attention that he has a left rib injury in which they told him that first, they have to treat his overdose because its his chief complaint, and thereafter they will tend to his secondary complaints.

(124) Fearful that the medical staff will diagnose and treat plaintiff's left rib injury after they are done giving him treatment for overdose, the Co's had somehow influenced the medical staff to discharge plaintiff without treatment for his overdose all because they didn't want them to NOTE and treat plaintiff

60

left rib injury after tending to his
chief complaint.

(125)    On 1/15/2021, plaintiff was discharged
from the outside hospital without
treatment for his chief complaint
and without his left rib injury
being diagnose and treated.

(126)    Plaintiff was taken back to Elmira
where he was placed in the
Medical Infirmary ("Infirmary")
on Medical and suicide watch.

(127)    On 1/16/2021, while plaintiff was
in the infirmary on Medical and
suicide watch, the CO, who was
assigned to keep watch over
plaintiff, had given plaintiff a
plastic utensil ("spork") with
his meal.

(128)    After noticing the mistake that
he made, the CO refused to take
the spork back from plaintiff,

61

who was restricted from using the spork while on suicide watch.

(129) Instead, the CO told plaintiff that if he think about using the spork to harm himself, just know that he don't care if plaintiff.

(130) While on Medical and suicide watch in the infirmary, plaintiff had been doing nothing but reflecting on the fact that he is suffering from a painful left rib injury which staff is refusing to treat, and how he sustained such injury from staff who retaliated and physically assaulted him for making a PREA complaint on staff that used force on him and performed un-consensual oral sex on him in Wende.

(131) Due to reflecting on all the past and present trauma that plaintiff experience, it caused him to have another Mental Breakdown in which

plaintiff took the spork that the co had given him, broken a piece of the handle off the spork and shoved it down into his penis.

(132) Plaintiff was rushed to the outside hospital where he had to have surgery so that the broken piece of the handle can be removed from out of his penis.

(133) After his surgery, plaintiff was discharged from the outside hospital, and sent back to Elmira where he was placed on suicide watch in the OMH unit.

(134) Ever since the spork handle was removed from his penis, plaintiff been having problems catching a erection; it was hard for his penis to go up and it was in pain.

(135) The major contributing factor that

63

caused plaintiff to self mutilate and damage his penis was because plaintiff believe his penis is DEFILED and for that reason he do not want his penis anymore due to it being a Male staff who sexually assaulted him by performing oral sex on his penis.

(136) Other contributing factors that caused plaintiff to self mutilate and damage his penis, was his hopes to get medical treatment for his left rib injury while at the outside hospital for damaging his penis but his plans were unsuccessful like his attempt on 1/15/2021.

(137) While on suicide watch, plaintiff been continuing making complaints to OMH, Medical, and Doccs staff about his left rib injury.

(138) However, all his emergency sick call request's had been ignored by

64

them all.

(139) Plaintiff even continued to complain and make emergency sick call requests for his injuries once he was discharged from suicide watch on January 22, 2021 and returned to his assigned cell in the SHU.

(140) However, all his emergency sick call requests had been ignored until February 3rd, 2021, when plaintiff was seen by a Medical Provider, who had given plaintiff a physical exam and noted that he have a lump protruding out of his left rib in which she ordered a MRI test for his rib.

(141) However, Plaintiff was transferred from Elmira SHU to Five Points RMHU on 2-11-2021.

(142) Plaintiff was transferred from Elmira to Five Points without

having any treatment for his left
rib injury in which his Medical
Provider noted on February 3rd,
2021 and ordered a MRI test
for his left rib injury.

(143) Plaintiff was transferred to Five
Points RMHU, which is a OMH
program for serious mentally
ill incarcerated individuals
who are serving SHU sanctions.

(144) Upon his arrival to Five Points on 2-11-21
, as a New Admission, plaintiff was initially
screened by Nurse Mott where he brought
all his medical problems to her attention,
mainly left rib injury, and his breathing
difficulties.

(145) However, for a unknown reason, Nurse
Mott had placed plaintiff on suicide
watch. Plaintiff was taken to the
RMHU area by Sgt. Fisher, CO Mosko
, and CO Kent and placed and locked in
a cage in the RMHU Intake/Property

room.

(146) Sgt. Fisher asked plaintiff a few questions in which based on his answers, Sgt. Fisher, Co Mosko, and Co Kent found out that plaintiff is a victim of a sexual assault and that he, fear for his safety. From that point plaintiff was being sexually harassed by Co Kent, Co Mosko, and Sgt. Fisher after the officer who was strip frisking plaintiff was satisfied with his cooperation in the strip frisk he conducted.

(147) As soon as plaintiff strip frisk officer was satisfied with his rectum check of his strip frisk. Co Kent started calling plaintiff out of his name and started yelling "back that ass up!!", in which plaintiff did, and he yelled again "back that ass up", in which plaintiff did for him again.

(148) Plaintiff was given a OMH suicide watch smock to put on. That's when

67

Sgt. Fisher told him to pull the foreskin of his penis back, in which he did.

(149) Plaintiff backed his ass up and pulled back his foreskin of his penis for CO Kent, CO Mosko, and Sgt. Fisher because he was scared that they will physically assault him if he don't listen.

(150) Plaintiff was so scared that when they started sexually harassing him, Plaintiff started covering his penis with his hand, because he started having flash backs of when staff in Wende had sexually assaulted him by using force on him and putting plaintiff's penis in his mouth and sucked it.

(151) After plaintiff was escorted out of the RMHU Intake / Property Room, plaintiff was escorted and placed in C-13 cell of the RMHU and placed on a 1 on 1 suicide watch where the CO who was first watching plaintiff on the 1 on 1 watch had

68

turned on plaintiff's bright light using the control switch from outside plaintiff's cell.

(152) The mattress in plaintiff cell was soiled by what seemed to be some unknown person body fluids which forced plaintiff to sleep on the hard bed frame while the mattress remained on the floor, the cell door, shower, toilet, sink, walls, and floor was dirty and it was covered in a unknown person body fluids.

(153) On 2-12-2021, during morning sick call/medication rounds, Nurse Colbert came to plaintiff cell with Co Kent. Plaintiff requested for his inhaler because he was having breathing difficulties.

(154) Nurse Colbert told plaintiff that it don't look like he need his inhaler and put his inhaler on his cell door slot and then she dumped a

69

unknown strange pill from a envelope into plaintiff's hand.

(155) Plaintiff asked Nurse Colbert for his prescribed Meds which was his Topamax, Prolisec, and Ibuprofen, but she gave a unreasonable excuse for not having it and she snatched his inhaler Knowing that plaintiff didn't use it yet, due to him asking for his prescribed medication.

(156) Plaintiff told Nurse Colbert that he didn't use his inhaler and that he need it because he's having breathing difficulties but she just ignored him

(157) While Nurse Colbert was handling me the way she did, Co Kent was by my door laughing and he claimed to be responsible for Nurse Colbert actions towards me.

(158) Thru out the day and night of February 12, 2021, Plaintiff made repeated emergency sick call request to staff for his rib injury and breathing difficulties but OMH, Medical, and Doccs staff failed to get him any treatment for his injuries he displayed to them.

(159) However, plaintiff did see a Medical Provider, who did nothing but made matters worst when she discontinued the use of his inhaler and she discontinued his Topamax prescription which was giving to him to prevent his headaches.

(160) She noted that plaintiff have a very big hard lump on his left rib but failed to give plaintiff treatment for it.

71

(161) On March 3rd, 2021, Plaintiff had shoved a broken spoon handle into his urethra of his penis.

(162) The major contributing factor that caused plaintiff to self-mutilate and damage his penis was because plaintiff believed his penis is DEFILED and for that reason he do not want his penis anymore due to it being a Male staff who sexually assaulted him at Wende by performing oral sex on his penis.

(163) The other contributing factors that caused plaintiff to self mutilate and damage his penis, was his hopes to get medical treatment for his left rib injury while at the outside hospital for damaging his penis but his plans were unsuccessful like his attempts were on 1/15/2021 and on 1/16/2021 because the

72

Medical, and Doccs staff refused to take plaintiff to the outside hospital for self-mutilating and damaging his penis.

(164) Instead they had a Nurse Practitioner to perform surgery in the infirmary of Five Points, and extract the broken spoon handle from out of his penis, in the infirmary of Five Points.

(165) On March 25, 2021 the CO allowed another seriously mentally ill incarcerated individual to throw Feces / bodily fluids on plaintiff, by opening both of their cell door slots, where the serious mentally ill incarcerated individual was able to throw feces thru plaintiff slot landing it on his underwear, legs, and feet, and slippers.

(166) While serving SHU time in Five Points

RMHU, Plaintiff made numerous complaints, and emergency sick call requests in regards to his left rib injury.

(167) However, all his complaints and emergency sick call requet's were ignored

(168) Plaintiff was released from Five Points RMHU "and transferred to Great Meadow Correctional Facility on June 15, 2021

(169) Plaintiff was transferred from Five Points RMHU to Great Meadow Correctional Facility ("Great Meadow") without having any medical treatment for his left rib injury.

(170) The constitutional basis for this claim under 42 U.S.C. § 1983 is:

(a) This claim is for the violation of plaintiff's Fourteenth Amendment right, committed by Ho Bottone,

74

who denied the plaintiff DUE PROCESS OF LAW:
When she denied him his right to have a
impartial decision-maker, when she denied
plaintiff his right to have witnesses, and
when she denied the plaintiff his right to
be heard, on February 3rd, 2021 and February
9, 2021 at Elmira.

(171) Plaintiff requests that this court grant him
the following relieff:

(172) Issue a declaratory judgment stating that:
(a)                           HO Bottone violated
plaintiff's Fourteenth Amendment right
when she denied plaintiff Due Process
of Law.

(173) Award compensatory damages in the following
amounts:
(a)            $30,800 against HO Bottone,
which amounts from $200 for each day
plaintiff served time in the SHU/RMHU
while he was wrongfully confined in the

75

SHU/RMHU starting from January 12, 2021 to June 14, 2021

(174)  Award punitive damages in the following amounts:

(a)              $15,000 against Ho Bottone

(175)      Exhaustion of Your Administrative Remedies for this Claim:

(a)    Did you grieve or appeal this Claim? Yes, Plaintiff filed an administrative appeal dated February 24, 2021, with Acting Commissioner Anthony J. Annucci where he pointed out his actual innocence, and how Ho Bottone violated his Due Process Rights when she denied his right to have a impartial decision-maker, when she denied plaintiff his right to have witnesses, and when she denied the plaintiff his right to be heard See Exhibit 9.

76

(b)  If yes, what was the result? On Behalf of Acting commissioner Anthony J. Annucci, D. Venettozzi had reviewed plaintiff's hearing and reversed it on April 28, 2021 See Exhibit 10.

(176)  If you did not exhaust your administrative remedies, state why you did not do so:

(a)  If there are any Claims that plaintiff failed to exhaust, PLEASE TAKE NOTICE that plaintiff is suffering from signs and symptoms that are consistent with him having a Traumatic Brain Injury /Post-Concussion in which it prompted medical staff to order diagnostic testing for his brain See Exhibit 4

6. RELIEF SOUGHT

(1) Plaintiff request the following relief for the FIRST CLAIM:

77

(2) Issue a declaratory judgment stating that:

(a)    Co Abrams violated plaintiff's Eighth Amendment right to be free from infliction of cruel and unusual punishment due to being deliberately indifferent to plaintiff's safety.

(b)    Supt. John Doe #1, Dss Brown, and ADSM Szablewski had violated plaintiff's Eighth Amendment right to be free from infliction of cruel and unusual punishment due to being deliberately indifferent to plaintiff's safety.

(3)    Award compensatory damages in the following amounts:

(a)    $1,500,000 against Co Abrams for the physical, mental and emotional injuries plaintiff sustained as a result of being physically assaulted by another seriously mentally ill incarcerated individual.

78

(4) Award punitive damages in the
   following amounts:

(a)                         $150,000 against
   CO Abrams

(b)                       $150,000 each
   against Supt. John Doe #1, Dss Brown
   , and ADSM Szablewski

(5) Plaintiff request the following relief
   for the SECOND CLAIM:

(6) Issue a declaratory judgment
   stating that:

(a)                  CO Davis and Sgt.
   Dininny violated plaintiff's
   Eighth Amendment right to be
   free from infliction of cruel and
   unusual punishment due to using
   unneccessary / excessive use of
   force

(b) Nurse Hakes violated plaintiff's
   Eighth Amendment right to be free
   from infliction of cruel and unusual

79

punishment due to being deliberately indifferent to plaintiff's serious medical needs

(7) Award compensatory damages in the following amounts:

(a)     $2,500,000 jointly and severally against Co Davis, and Sgt. Dininny for the physical, and emotional injuries which plaintiff sustained as a result of Co Davis and Sgt. Dininny using unneccessary / excessive force on him

(b)     $500,000 against Nurse Hakes for the physical, and emotional injuries which plaintiff sustained as a result of Nurse Hakes failing to provide him with adequate medical care.

(8) Award punitive damages in the following amounts:

80

(a)        $150,000 each against Co Davis, and Sgt. Dininny.

(b)        $150,000 against Nurse Hakes.

(9)    Plaintiff request the following relief for the THIRD CLAIM:

(10)    Issue a declaratory judgement stating that:

(a)        Ho Bottone violated plaintiff's Fourteenth Amendment right right when she denied plaintiff Due Process of Law

(11)    Award compensatory damages in the following amounts:

(a)        $30,800 against Ho Bottone, which amounts from $200 for each day plaintiff served time in the SHU/RMHU while he was wrongfully confined in the SHU/RMHU starting from January 12, 2021 to June 14, 2021.

81

(12) Award punitive damages in the following amounts:

(9)                    $ 15,000 against HO Bottone.

(13) Do you want a jury trial? Yes, Plaintiff wants a jury trial.

(14) I declare under penalty of perjury that the foregoing is true and correct.

Executed on  March 21, 2023

Jundrian Walker
11A1158
Prose
J. Walker

82